# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 99 C 4126 | DATE | 3/25/2002 |
| CASE TITLE | Nancy King vs. Kenneth Apfel | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] For the reasons stated in the attached Memorandum Opinion and Order, the Commissioner's motion for summary judgment is granted. [Doc. #s 8]. This case is closed and all other motions are terminated as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | number of notices | Document Number |
|---|---|---|---|---|
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | MAR 26 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | 13 |
| | Copy to judge/magistrate judge. | | | |
| vg(lc) | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Nancy King, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 99 C 4126 |
| v. | ) | |
| | ) | HONORABLE DAVID H. COAR |
| Kenneth Apfel, | ) | |
| | ) | |
| Defendant. | ) | |

DOCKETED
MAR 2 6 2002

## MEMORANDUM OPINION AND ORDER

This is an action for judicial review of the final administrative decision of the defendant, Commissioner of Social Security (the "Commisioner"), finding that plaintiff, Nancy King ("Ms. King" or "King"), is not entitled to Disability Insurance Benefits (DIB) under §§ 216(i) and 223, or Supplemental Security Income under § 1614a of the Social Security Act ("SSA" or the "Act") as amended. This court has jurisdiction over this action pursuant to 42 U.S.C. §§ 405(g), 1382c.

For the following reasons, this court finds that Ms. King is not entitled to Disability Insurance Benefits under the SSA.

### Procedural Background

Ms. King applied for DIB and SSI on March 7, 1995, alleging disability since August 20, 1993, due to pain in her lower back and pain in both of her legs (Tr. 100-03). These applications were denied initially (Tr. 104-13), and on reconsideration (Tr. 115-18). On November 1, 1995, Ms. King requested an administrative hearing (Tr. 119), and on November 3, 1997, she appeared and testified before Administrative Law Judge (ALJ) Maren Dougherty (Tr. 41-82). A friend,

1



Andrew Murphy, testified (Tr. 82-85), as did Christopher Yep, a vocational expert (Tr. *85-95)*. Ms. King was represented by counsel. On January 30, 1998, AU Dougherty found that Ms. King was not disabled because she could perform her past relevant job as a medical secretary as that job is customarily performed in the national economy (Tr.26-28).

Ms. King requested Appeals Council review, but on April 23, 1999, the Appeals Council denied Ms. King's request for review (Tr. 4-5). The Appeals Council considered the contentions raised in her request for review and the contentions raised in a letter from her representative dated February 5, 1999, but found that neither provided a basis for changing the AU's decision (Tr. 4). The denial of review left the ALJ's decision as the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481. Ms. King now seeks judicial review of the Commissioners final decision pursuant to 42 U.S.C. §§ 405(g), 1382c.

**Statement of Facts**

*A. Testimony of Ms. King*

Ms. King, born February 23, 1935, was sixty-two years old on the date of the AU's decision (Tr. 45). She completed high school and attended college for two years (Tr. 46). She stopped working for Catholic Charities in August 1996 (Tr. 47). She described this job as part-time work, four hours each day, five days each week (Tr. 48). The job involved typing, filing, and greeting visitors and directing them to the proper offices (id.). Ms. King testified that she stopped working after she re-injured her back (Tr. *50)*. Prior to working for Catholic Charities, Ms. King had worked full-time for the VA Medical Center in North Chicago (Tr. 51).

Ms. King alleged that she was unable to work due to back problems, and pain in her legs (Tr. *54)*. Ms. King could aggravate these pains by standing for too long a time or by sitting in one place

2

for a long time (Tr. 55). Ms. King stated that she had experienced back problems since 1992 (id.). She had not worked full-time for Catholic Charities due to feeling tired all the time. Ms. King alleged that she still felt tired frequently (Tr. 56). She also complained of shoulder problems and stated that she could not raise her arm all the way and could not reach to her back without experiencing pain (Tr. 57). Ms. King alleged that she experienced tingling in the fingers of her left hand (id.).

Ms. King saw Dr. Grossman, a psychiatrist, after she became concerned about depression and some outbursts that she had at work (Tr. 66). Dr. Grossman prescribed the medication, Zoloft, for Ms. King (Tr. 67). To relieve her back pain, Ms. King would either walk around for about twenty minutes, or take pills, usually Advil, an over-the-counter medication (Tr. 68). She stopped taking prescription pain medication because she could not afford it (Tr. 68).

Although she alleged that she experienced a "little bit" of trouble when driving, Ms. King testified that she drove to the grocery store and did her own shopping (Tr. 69). She doubted that she could lift grocery bags weighing more than five or ten pounds (Tr. 70-71). She cooked for herself, and did her own laundry (Tr. 71). Ms. King testified that she attended health seminars and did the home exercises suggested by her physical therapist, two or three times each week (id.).

*B. Testimony of Andrew Murphy*

Mr. Murphy testified that over the last two or three years, Ms. King had a tendency to "flare up quite easily" (Tr. 83). Mr. Murphy has observed that Ms. King was very careful about her movements and seemed to be in pain (Tr. 84). He also observed that Ms. King seemed to be unable to sit in one place for any significant period of time (id.).

*C. Medical Evidence*

3

On November 4, 1992, x-rays of Ms. King's lumbo-sacral spine revealed moderate to marked degenerative change involving the L4, LS and 51 spines with grade 1 pseudo-spondylolisthesis involving the L4 spine (Tr. 186, duplicate at Tr. 214).

On November 23, 1992, Shaku Chhabria, M.D., noted that Ms. King suffered an injury in January 1992, when she was hit on her right ear (Tr. 182). Since then, she had experienced tenderness and stiffness of her right shoulder and in her trapezius muscle. Ms. King also, reportedly, experienced some paresthesias in her right arm. Dr. Chhabria advised Ms. King that he based these finding upon her complaints of post-traumatic headaches and cervical strain (id.).

On November 24, 1992, Dr. Chhabria reviewed the results of nerve conduction studies and found that they revealed denervation in Ms. King's C7-T1 muscles (Tr. 181). Dr. Chhabria noted that such findings could be indicative of a brachial plexus injury or of underlying radiculopathy (disease of nerve roots) (id.).

Treatment notes between February 16, 1993 (Tr. 168) and April 1993 (Tr. 162), recorded Ms. King's complaints of neck, nerve, shoulder, and lower back pain. She received treatment that included heat therapy on her back, neck, and shoulders (Tr. 168).

On April 30, 1993, Dr. Chhabria noted that Ms. King's symptoms currently included right leg tingling and numbness (Tr. 196). Ms. King had tenderness, spasm, and painful range of motion with a positive straight leg raising sign. Dr. Chhabria advised electromyographic testing (id.).

On May 3, 1993, Dr. Chhabria observed that nerve conduction studies showed denervation at L5-S 1 and innervated muscles that could be indicative of underlying radiculopathy (Tr. 195).

On May 13, 1993, a magnetic resonance imaging (MRI) scan of Ms. King's cervical spine showed of evidence of spondylosis at C3-4 through C6-7 that was most severe at the C5-6 and C6-7

levels (Tr. 212). An MRI of Ms. King's lumbar spine revealed posterior displacement of the L5 vertebral body. The study also revealed mild central spinal canal stenosis at L4-5. In addition, the epidural fat within the L5-S1 neuroforamina was considerably effaced bilaterally. There was also some effacement of the neuroforamina at L3-4 and L4-5 (id.).

On October 7, 1993, Dr. Chhabria reported a progression of Ms. King's symptoms that included weakness in her left arm (Tr. *205*). On October 8, 1993, nerve conduction and electromyographic (EMG) studies showed signs of denervation at Ms. King's innervated C5-6 muscles, a finding, according to Dr. Chhabria, that is usually indicative of underlying radiculopathy.

On November 8, 1993, Ms. King complained of tingling in her arm that radiated everywhere except into her little fingers (Tr. 187). She also complained of stabbing knee pain that radiated up her thigh and down her leg (id.).

On June 18, 1994, Ms. King reported that she had heel pain, and her doctor prescribed Naprosyn and heel lifts (Tr. 261). On November 5, 1994, Ms. King received a cortisone injection for plantar fasciitis (Tr. 249). On February 21, *1995*, Ms. King saw a Podiatrist who reported that she had heel spur syndrome (Tr. 217).

Ms. King sought treatment at Health Reach Clinic between April and September 1995 (Tr. 219). The treatment notes from the clinic recorded Ms. King's complaints of low back pain, neck pain, and chronic anxiety (id.).

On April 24, 1995, Marvin R. Fetter, M.D., reviewed x-rays of Ms. King's lumbosacral spine and stated that the studies revealed "near-obliteration" of the lumbosacral disc space, as well as degenerative spondylolisthesis grade I, at L4-L5 (Tr. *235*).

On April 29, 1995, Ms. King saw Karen A. Leone, M.D., and complained of low back pain,

5

headaches, and left shoulder pain (Tr. 291). Dr. Leone observed that Ms. King could ambulate twenty feet with a normal gait and without the need for assistive devices (Tr. 292). Although Ms. King had a full range of motion (ROM) in all joints, she experienced pain with motion of her left shoulder. She could perform gross and fine manipulations bilaterally. There were no signs of muscle atrophy (id.). Ms. King experienced tenderness with full range of motion of her cervical and lumbar spine (Tr. 293). Dr. Leone also reported that a neurological examination produced normal results (id.).

On May 15, 1995, an x-ray of Ms. King's cervical spine showed reversal of the lordotic curvature with slight kyphotic curvature from C1 to C3 and straightening of the cervical spinal curvature from C3 to C7 (Tr. 161, duplicates at 233, 296). The study also showed signs of hypertrophic degenerative change and evidence of degenerative disc disease with narrowing of the intervertebral disc space (id.).

On July 6, 1995, Lizette F. Romero, a physical therapist reported that at her initial session with Ms. King, they rated her neck pain 4/10 (10 being the most severe pain imaginable and 1 being no pain) and they rated Ms. King's back pain at 2/10 (Tr. 230). By the final treatment session, Ms. King could take her neck through a normal range of motion. Ms. King, however, still experienced pain with flexion, extension, and side bending. Ms. Romero recommended one or two more weeks of therapy (id.).

On September 7, 1995, a treatment note from Health Reach indicated that Ms. King needed something for her nerves, and was being seen for follow-up on her complaints of neck and back pain (Tr. 223).

On June 13, 1996, Elizabeth Woo-Strauss, M.D., noted that Ms. King had a history of

6

gastroesophageal reflux and sarcoidosis with lung and skin manifestations (Tr. 388).' Ms. King had been taking the medication Prednisone for the sarcoidosis, but that medication was exacerbating her reflux condition. Dr. Woo-Strauss, therefore, prescribed Axid to counteract these adverse symptoms (id.).

In a treatment note dated August 15, 1996, Dr. Woo-Strauss noted that Ms. King always had multiple complaints (Tr. *405)*. Ms. King did not want to try the medication, Prozac, and stated that she preferred a referral to a psychiatric clinic (Tr. 406).

On October 25, 1996, a whole body bone study revealed probable degenerative change in Ms. King's lower lumbar spine and arthritis in her right knee. Otherwise the results were those of a normal bone scan (Tr. 396).

On December 19, 1996, Dr. Woo-Strauss reported that Ms. King had stopped taking Axid and her reflux had improved (Tr. 394). Ms. King's skin also showed great improvement, especially the rash on her legs (id.). Thus, there was improvement in her sarcoidosis (Tr. *395)*. Ms. King, however, continued to complain of fatigue and depression (id.).

As of February 13, 1997, Ms. King was taking Lodine for pain, Axid, and Paxil, an anti-depressant, and one or two Tums tablets each day (Tr. 390). A treatment note from the same date stated that Ms. King felt very sluggish and fatigued because she was not sleeping well (Tr. 391). She continued to experience left shoulder pain. Ms. King had a bone scan and that study produced normal results. Her right shoulder had full ROM and her left shoulder was described as "WNL" (within normal limits). Ms. King's knees also had a good ROM with no effusion or warmth (id.).

A treatment note from April 2, 1997, recorded Ms. King's statement that her neck and shoulder problems tended to "come and go" (Tr. 444). At this time, however, she alleged that the

7

pain had worsened and rated it at a "7" usually, and a "9" at its worst (id.). On April 25, 1997, Ms. King complained that exercises had made her shoulder worse (Tr. 443). She had to relieve her shoulder pain with a hot pack. On April 29, 1997, Ms. King cancelled her appointment. On May 12, 1997, Ms. King reported that her shoulder(s) no longer ached while at rest, but that they caused pain when she raised her arms. The therapist noted that Ms. King was tolerating her new exercises (id.).

On October 16, 1997, King saw David M. Grossman, M.D., a psychiatrist, and complained that she had been depressed "for a while," had difficulty concentrating, experienced frequent temper flare-ups and slept poorly at night (Tr. 508-11). Ms. King traced her problems to an injury she suffered at work, after falling off a stool and injuring her back (Tr. 510). Dr. Grossman's mental status examination showed that Ms. King was oriented to time, place, and person. Although cooperative, she came across as somewhat anxious. She talked about memory loss, but Dr. Grossman commented that she seemed to have a decent memory on a day-to-day basis. Dr. Grossman opined that Ms. King was mildly depressed and had no suicidal, homicidal, or psychotic ideations. Dr. Grossman further commented that Ms. King's signs of depression did not seem to be severe enough to really be classified as a major depressive disorder. Ms. King seemed, however, to be preoccupied with her physical symptoms (id.). Dr. Grossman recommended the medication, Zoloft and individual therapy (id.).

*D. Vocational Expert's Testimony*

Christopher Yep testified as a vocational expert (VE) and classified Ms. King's past work as light, but noted that typically such jobs were performed at the sedentary level (Tr. 85). Mr. Yep classified the skill level of Ms. King's past jobs as "skilled" (Tr. 86).

*E. The ALJ's Decision*

The ALJ found that Ms. King had engaged in substantial gainful activity from November 1993, through the end of 1994. At step two, the ALJ found that Ms. King had severe impairments, but at step three, determined that those severe impairments did not meet or equal, individually or in combination, a condition in the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P. App. 1. At step four the ALJ determined that Ms. King's testimony was not fully credible, and that she retained the residual functional capacity (RFC) to perform sedentary work. Thus, the ALJ determined that Ms. King's impairments did not prevent her from performing her past relevant work (Tr. 26-2 8). King has referred to a treatment note submitted on September 10, 1996, by J. Brown, M.D. (Tr. 402-03). It appears, however, that Dr. Brown did not have an ongoing treatment relationship with Ms.

**Analysis**

In order to establish a "disability" under the Social Security Act (the "Act"), a claimant must show that he has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A claimant must demonstrate that his impairments prevent him from performing not only his past work, but also any other work that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A). The Social Security Regulations prescribe a sequential five-part test for determining whether a claimant is disabled. See 20 C.F.R. § 404.1520. Under this rule, the ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as

being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. See 20 C.F.R. § 404.1520; see also Young v. Secretary of Health and Human Services, 957 F.2d 386, 389 (7th Cir.1992); Phillips v. Massanari, 2001 WL 936120, *6 (N.D. Ill.)

A finding of disability requires an affirmative answer at either Step 3 or 5. A negative answer at any step other than Step 3, precludes a finding of disability. Id. The claimant bears the burden of proof at Steps 1 through 4, after which the burden of proof shifts to the Commissioner at Step 5. Id. In cases of severe impairment, the ALJ's analysis at Step 4 typically involves an evaluation of the claimant's residual functional capacity to perform the past relevant employment. See 20 C.F.R. § 404.1520(e). If a person can still do this kind of work, the Commissioner will find that person not disabled. Id. Step 5 analysis involves an evaluation of the claimant's residual functional capacity to perform any other work in the national economy (other than the relevant past employment). Bowen v. Yuckert, 482 U.S. 137, 142 (1987); 20 C.F.R. § 1520(f).

*A. Credibility Determination*

This court must determine whether the Commisioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); Luna v. Shalala, 22 F.3d 687 (7th Cir. 1994). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Luna, 22 F.3d at 689 (quoting Richardson v. Perales, 402 U.S. 389, 402 91971)). Under substantial evidence review, the court will not reevaluate the facts, reweigh the evidence, or substitute its judgement for that of the ALJ. Id. After reviewing the record as a whole, the court must accept the ALJ's finding if they are

supported by substantial evidence. Meredith v. Bowen, 833 F.2d 650, 653 (7th Cir. 1987). A finding may be supported by substantial evidence even if a reviewing court might have reached a different conclusion. Delgado v. Bowen, 782 F.2d 79, 83 (7th Cir.1986) (*per curiam*). However, the Commissioner (or ALJ) is not entitled to unlimited judicial deference. The ALJ must consider all relevant evidence and may not select and discuss only that evidence which favors his or her ultimate conclusion. Herron, 19 F.3d at 333. Although the ALJ need not evaluate in writing every piece of evidence in the record, the ALJ's analysis must be articulated at some minimal level and must state the reasons for accepting or rejecting "entire lines of evidence." Id. See also Young, 957 F.2d at 393 (ALJ must articulate reason for rejecting evidence "within reasonable limits" if there is to be meaningful appellate review); Guercio v.. Shalala, No. 93 C 323, 1994 WL 66102, *9 (N.D.Ill.1994) (ALJ need not spell out every step in reasoning, provided the ALJ has given sufficient direction that the full course of the decision may be discerned) (citing Brown v. Bowen, 847 F.2d 342, 346 (7th Cir.1988)). The written decision must provide a "logical bridge from the evidence to [the] conclusion" that allows the reviewing court a "glimpse into the reasoning behind [the] decision to deny benefits." See, e.g., Zurawski v. Halter, 245 F.3d 881, 887-89 (7th Cir.2001) (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir.2000)).

In this case, the ALJ determined at Step Three that King's severe impairments did not meet or equal, individually or in combination, a condition in the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, App. 1. Further, at Step Four the ALJ determined that King's testimony was not fully credible, and that she retained the residual functional capacity (RFC) to perform sedentary work, and, therefore the ALJ determined that King's impairments did not prevent her from

11

performing her past relevant work.

King challenges this determination on two grounds: first, she contends that the ALJ erred in rejecting her complaints of disabling pain as not "fully credible"; second, she argues that the ALJ's conclusion regarding the claimant's ability to perform a range of "sedentary work" is not supported by substantial evidence. For the reasons set forth below, this court finds that the ALJ's credibility determinations is supported by substantial evidence, and that the evidence logically supports ALJ's conclusion regarding King's ability to perform a range of sedentary work.

King argues that the ALJ improperly discounted her complaints of pain and failed to follow the SSA's pain assessment guidelines. After review of the ALJ's opinion, the Court disagrees.

King argues that the ALJ improperly discounted her complaints of pain and failed to follow the SSA's pain assessment guidelines. After review of the ALJ's opinion, this court disagrees.

An ALJ's credibility findings will not be overturned by a court unless they are "patently wrong." Powers v. Apfel, 207 F.3d 431, 435 (7th Cir.2000). However, a decision regarding a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Zurawski, 245 F.3d at 887 (quoting SSR 96-7p). The ALJ must minimally articulate his reasons for crediting or rejecting evidence of disability. Scivally v. Sullivan, 966 F.2d 1070, 1076 (7th Cir.1992). But only a minimal level of articulation by the

ALJ as to his assessment of the evidence is necessary. Stein v. Sullivan, 966 F.2d 317, 320 (7th Cir.1992).

When evaluating a claimant's subjective complaints of a disabling pain, a two- step process must be followed. C.F.R. § 404.1529. Initially, the ALJ must determine whether the pain alleged is substantiated by objective medical evidence. Luna, 22 F.3d at 691. If the complaints of pain are not supported by the objective medical evidence and the claimant indicates that pain is a significant factor of her alleged inability to work, then the ALJ must obtain detailed descriptions of claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. Id. The ALJ "must investigate all avenues presented that relate to pain, including [the] claimant's prior work record information and observations by treating physicians, examining physicians, and third parties. Factors that must be considered include the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for the relief of pain, functional restrictions, and the claimant's daily activities." Zurawski, 245 F.3d at 887; SSR 96-7p. The ALJ may not select and discuss only that evidence which favors his ultimate conclusion. Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).

In this case, although King has asserted that the ALJ's credibility determination is "patently wrong", she has not supported her assertion with sufficient evidence. The ALJ adequately considered the testimony and evidence produced on behalf of King in a manner reasonably calculated to support its conclusion. The ALJ is not required to address every word of testimony or every piece of evidence presented on behalf of a claimant. Consequently, the ALJ"s decision to remain silent on Ms. Murphy's testimony is not reason enough to disturb the ALJ's

13

credibility determination.

Additionally, King argues that Dr. Leone's April 1995 report, which did not provide any indication that King had any difficulty walking, does not discredit her claims of prolonged pain upon sitting. King's approach to the relevancy of Dr. Leone's report, however, is illogical. The fact that Dr. Leone's report neither supported nor negated any her complaints of lower back pain or any other type of pain does not mean that such report can taken to have left the door open to any possible diagnoses. Rather, the ALJ sufficiently considered Dr. Leone's report and the reports of additional medical personnel and determined that such diagnoses did not affirmatively support King's claims. Therefore, the ALJ's credibility determination stands.

*B. Sedentary Work Determination*

We now turn to the ALJ's conclusion that Ms. King "has the residual functional capacity to perform work-related activities except for work involving lifting/carrying more than 10 pounds occasionally in a job that does not require standing/walking more than two hours in an eight hour workday." (Finding No. 8). Based on this finding, the ALJ concluded that Ms. King could perform his past work as a medical secretary. (Finding No. 9). Ms. King contends that the ALJ made independent medical determinations and improperly determined that she was able to work despite her impairments. This court disagrees with Ms. King.

In making this finding, the ALJ reported that Ms. King "does not have any limitations in sitting" and therefore "the claimants medically determinable impairments limit her to sedentary work." The medical evidence supports this conclusion.

Given that ALJ found that Ms. King engaged in disqualifying substantial activity between November 1993 and December 31, 1994, Ms. King must demonstrate that she became disabled

14

between January 1, 1995 and January 30, 1998. During that time period, no doctor recommended that Ms. King be admitted to the hospital and no doctor said that she was disabled. Dr. Woo-Strauss, who was seeing Ms. King on a continuing and regular basis, did not suggest that Ms. King's symptoms were disabling. Ms. King contends that the ALJ erred when she referred to the results of King's bone scan as negative. A treatment note that Dr. Woo-Strauss submitted on February 13, 1997, however, states that Ms. King "has nl bone scan looking joint inflammation and an essentially normal bone dexa looking for osteoporosis." (Tr. 391). Thus Dr. Woo-Strauss's interpretation of the bone scan results appears to be consistent with the ALJ's finding that the bone scan results were normal. Further, even if the evidence of Ms. King's disabling condition were not visible by bone scan, such a possibility certainly would have been noted with more emphasis by the medical personnel who attended to Ms. King.

Consequently this court finds that the ALJ logically concluded that Ms. King has the functional capacity to perform her past relevant work as a medical secretary. The Commissioner's motion for summary judgment is granted and the plaintiff's motion for summary judgment is denied.

## Conclusion

For the foregoing reasons, the Commissioner's motion for summary judgment is granted.

Enter:

**David H. Coar**

**United States District Judge**

**Dated:** March 25, 2002

16